**Joseph SCHEIDLER, Plaintiff,**

**v.**

**NATIONAL ORGANIZATION FOR WOMEN, INC., et al., Defendants.**

**No. 90 C 109.**

United States District Court,
N.D. Illinois, E.D.

May 21, 1990.

iture of any state funds. Relief of this kind is not prohibited by the Eleventh Amendment.

*See Artist M., supra,* at 698–99.

Joseph M. Scheidler, Thomas Brejcha, Abramson & Fox, Chicago, Ill., for plaintiff.

Fay Clayton, C. Philip Curley, Kahn, Robinson, Curley & Clayton, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

PLUNKETT, District Judge.

Defendant, the National Organization for Women ("NOW"), along with others, sued plaintiff Joseph Scheidler ("Scheidler") and others in the United States District Court for the Northern District of Illinois for violation of the antitrust laws by participating in a conspiracy to close abortion clinics. NOW, through its officers defendants Molly Yard ("Yard"), President of NOW, and Patricia Ireland ("Ireland"), Vice–President of NOW, held a press conference in Washington, D.C. and issued a news release discussing the case and announcing that NOW was amending their complaint to add counts for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

Plaintiff Scheidler subsequently brought this suit for defamation in Illinois state court, claiming that statements made at the press conference and in the news release by defendants constituted defamation *per se*. Plaintiff alleges two counts of defamation *per se*, one based upon words imputing the commission of the crimes of arson and bombing and aiding and abetting arson and bombing, and one based upon words injuring plaintiff in his profession as a "non-violent crusader on behalf of the rights of unborn persons." Complaint, Counts I and II, ¶¶ 20–21. Defendants removed the case to this court and now seek to dismiss it on numerous grounds. For the reasons described below, we grant defendants' motion to dismiss.

### Facts

NOW filed a complaint against Scheidler and others for violation of the antitrust laws. We take judicial notice of the contents of NOW's original complaint, in which NOW alleged:

17. Since at least 1984, the defendants have agreed and conspired among themselves and with others to drive every clinic such as DWHO [Delaware Women's Health Organization] and the Ladies Center in the United States out of business.

18. In June 1984, the defendants met in Kansas City, Missouri, to formulate a six-month plan of national activities. The plan, which included "blitzes" of abortion clinics, was designed to close down as many abortion clinics across the country as possible.

19. In April 1985, the Pro–Life Action Network, a nationwide coalition of over 70 "activist" anti-abortion organizations, held its annual meeting in Appleton, Wisconsin, and pledged to create "a year of pain and fear" for anyone receiving or performing an abortion. Both defendants participated in this national meeting.

20. In pursuit of their goal to drive every clinic such as DWHO and the Ladies Center out of business, the defendants have traveled throughout the country engaging in, or encouraging others to engage in, unlawful, concerted action, including repeated acts of trespass and vandalism, directed at women's health

centers such as DWHO and the Ladies Center.

21. Defendant Scheidler has distributed a manual, *Closed: 99 Ways to Stop Abortion,* outlining methods intended to be used to interfere with and stop women's health centers such as DWHO and the Ladies Center from operating.

22. Defendant Scheidler's manual, *Closed: 99 Ways to Stop Abortion,* encourages the use of unlawful activities and methods to drive women's health centers such as DWHO and the Ladies Center out of business.

23. Defendant Scheidler has traveled throughout the country training other persons to use the methods outlined in *Closed: 99 Ways to Stop Abortion* and encouraging them to drive women's health centers such as DWHO and the Ladies Center out of business.

24. Defendant Scheidler has traveled throughout the country leading efforts to shut down women's health centers such as DWHO and the Ladies Center and encouraging the use of unlawful methods to do so.

. . . .

30. On March 26, 1986, defendant Scheidler and others went to the Ladies Center to lead an effort to shut it down. During the course of their efforts, a number of persons, including Joan Andrews and John Burt, stormed the clinic. John Burt injured Linda Taggert, the clinic administrator, and Georgia Wilde, the president of the Escambia County NOW chapter. Ms. Andrews ransacked a medical procedures room destroying surgical supplies. · Both Ms. Andrews and Mr. Burt had to be subdued by the police. . . . Both have been convicted on criminal charges as a result of their actions.

. . . .

32. On April 11, 1986, in furtherance of the nationwide effort to close down women's health centers that perform abortions, defendant Scheidler unlawfully entered DWHO. Defendant Scheidler told the clinic administrator, Cathy Conner, that he had come to "case the place"

because he and his followers intended to force DWHO to close. He stated that he and others intended to make Delaware the first abortion free state in the nation. He threatened Ms. Conner with reprisals should she refuse to quit her job.

. . . .

34. Defendant Scheidler was arrested and charged with criminal trespass and harassment on April 12, 1986, as a result of his actions at DWHO the previous day. He was subsequently convicted and fined.

NOW and its coplaintiffs subsequently amended the complaint to add RICO counts in addition to the antitrust claims, based upon the same factual premises. Just prior to amending the complaint they held a press conference in Washington, D.C. and issued a news release concerning the lawsuit. Statements contained in the news release and made at the press conference are the subject of this lawsuit.

NOW issued a news release on November 28, 1988, which said,

The National Organization for Women today demanded that President Reagan, President-elect Bush and Attorney General Thornburgh prosecute anti-abortion extremists for their escalating violations of federal statutes, including racketeering, anti-trust and anti-Klan laws.

"President Reagan has refused to allow Yasser Arafat into this country, calling him a terrorist. *But he ignores the terrorists already operating in this country, the anti-abortion extremists operating through a pattern of violence, threats and intimidation* to close family planning facilities and clinics which offer abortion," said NOW President Molly Yard.

. . . .

NOW . . . filed a class-action anti-trust suit in June 1986 on behalf of all women and all women's health care facilities performing abortions. The suit alleges a nationwide conspiracy to close clinics through illegal means and names as defendants Joseph Scheidler, John Ryan and their organizations, the Pro–Life Action League and the Pro–Life Direct Ac-

tion League. The federal district court in Chicago, before whom the case is pending, last week confirmed that under a newly-issued order the plaintiffs were free for the first time to detail what they have learned in the case.

"*The extremists are carrying out a strategy organized by a five-member steering committee of the Pro–Life Action Network (PLAN), a group which, since at least 1984 has trained extremists in clinic invasions, sit-ins and other illegal tactics.* The all-male steering *committee included defendants Joseph Scheidler....*

"This committee ... took an active role in organizing sit-ins and clinic invasions at abortion clinics nationwide under the name 'Operation Rescue.' Their goal in blocking access to the clinics is not only to prevent patients and staff from entering or exiting, but also to create a threatening atmosphere and a public image of danger at the clinics.

. . . .

[D]efendant Joe Scheidler was known as the Green Beret of the anti-abortion movement.

. . . .

"The anti-abortion extremists' nationwide conspiracy to make abortion and birth control unavailable continues, but with a new face.... *This is the same crowd,* they do not believe in the civil rights of women, *and they are not non-violent.*

Complaint, Exhibit A (emphasis added). The press release also contained a section entitled FACTUAL BACKGROUND OF *NOW V. SCHEIDLER,* which further discussed the allegations of NOW's complaint, but which is not alleged by Scheidler to contain any defamatory statements.

Scheidler also complains that defamatory statements were made at the press conference NOW held in Washington, D.C. on November 28, 1988. The transcript of the press conference, attached to Scheidler's complaint, shows that the following statements were made:

MS. YARD: ... we are now free to talk about the case.

We filed it some time back ... and it was against Joe Scheidler and against John Ryan. Joe Scheidler has been active in the anti-abortion movement and considers himself a leader of it. And, he has been responsible, along with John Ryan, for training people in how to terrorize people going into clinics and, indeed, how to invade clinics.

. . . .

And ... we are asking President Reagan and Attorney General Thornburgh to see that the laws are enforced. There are a number of laws which they are violating and including racketeering, anti-trust, and anti-clan laws.... [W]e will keep after the Justice Department to carry out its responsibilities. We cannot pursue criminal cases against these people, our cases are civil. *And, but we do believe that they are criminal acts. They have burned and bombed many clinics and that has decreased a lot since we have filed our case* and John Ryan, as a matter of fact, has withdrawn active participation in the, uhm, so called "Right to Life Movement." *Joe Scheidler has been much quieter* and now that we are extending the case to include these other individuals, we suspect they will be a lot quieter too.

. . . . .

MS. IRELAND: ... Operation Rescue ... was planned by the Pro–Life Action Network. They began speaking of it as early as 1986, when ... *Joe Scheidler* and John Ryan ... *were in Tallahassee along with Randy Terry to picket at the Ladies Center, which they had previously invaded, injuring the clinic administrator and our NOW President, there....* [W]ith John Ryan and Joe Scheidler as co-sponsors, Randy Terry became the front man, the spokesman for Operation Rescue, which is simply putting a new face forward because he had not been named as one of the defendants in our lawsuit, and also because *Scheidler and Ryan were more associated with the more overtly violent tactics....*

[T]he clinic invasions have involved threats of reprisals against clinic administrators, saying that if they did not get out of the clinic business, that their lives would be made miserable. Our people in Pensacola, for instance, got calls in the middle of the night, they got calls at work, they got calls asking, "Do you know where your children are? We do." Followed by hysterical laughter. There has been a great deal of extortion put on the clinics and the clinic workers and the patients to stop them from moving forward with their right to medical services.

REPORTER: How can you be certain that those threats are linked to Joe Scheidler and his organization?

MS. IRELAND: Well, some of them we know are linked. *Joe Scheidler marched into the Delaware Women's Health Organization ... and announced that he was there to case the place.* Those threats, we do not have any tie in. We can say that clearly, both the anti-abortion rhetoric that Ronald Reagan and George Bush have been putting, and the rhetoric that Joe Scheidler put out where they say, "We can't wait for the law to change, we have to take action in our own way and directly against the clinics." When they say, *when Joe Scheidler says, "I have never lost a tear for real estate being destroyed." Or, when he says, talking about their counselors, who try to talk women out of having an abortion, "If one of our counselors in a clinic drops a lighted cigarette in a waste basket, so what?"* That was another public statement of his. *Certainly that is encouraging and aiding abetting [sic] the people who are involved in the arson and bombings.*

At one of the Plan conferences in 1985, the Pro–Life Action Network met in Appleton, Wisconsin, they met in a hotel that was owned by two of their people. The marquee at the hotel said across the marquee, "Have a blast." They wore under their lapel pins little firecrackers to symbolize the dynamite. That was in a year when they declared it to be "the year of pain and fear for anyone receiving or giving abortions." It's that kind of an atmosphere that they've created. *Ah, reading as an introduction to the conference, a letter from Curt Basida, who is in jail for bombings and arsons of clinics. These are the kinds of things that have a clear tie.*

. . . .

We don't have proof that they're planning to bomb a clinic. But we do know that their objective is to close down the clinics. . . .

Complaint, Exhibit B (emphasis added).

Scheidler's suit alleges that several of the statements above constitute defamation *per se.* He alleges that his approach to preventing abortion is peaceable and nonviolent, as detailed in his book, *Closed: 99 Ways to Stop Abortion.* Complaint, ¶ 10. He states that neither NOW's original, unamended complaint nor its amended complaint anywhere allege that he or any of his codefendants were involved, directly or indirectly, with arson or bombings of any kind. Complaint, ¶¶ 13, 18. He further alleges that discovery in that suit has produced no evidence that he was an arsonist or bomber or that he engaged in any violent acts or aided and abetted such acts. Complaint, ¶ 14. Scheidler alleges that the defendants issued a new release (quoted above) which they put on various news wires and which was therefore published in Illinois. He further alleges that they gave a press conference (quoted above), although he nowhere alleges that its contents were transmitted into Illinois. Complaint, ¶¶ 16, 17.

Count I alleges defamation *per se* based upon words imputing the commission of a crime. Scheidler alleges that the statements at the press conference and in the news release, taken together or separately, impute to him the commission of the crimes of arson or bombing and/or aiding and abetting these crimes and are defamatory *per se.* Count II alleges defamation *per se* based upon words injuring plaintiff in his profession, in that they impute to him the commission of the same crimes in Count I and injure him in

his profession as an advocate of non-violent, direct action to protect unborn persons, to protect their unwitting mothers from the dangerous, life-threatening physical and psychological trauma of abortion, to provide women with the truth about the violence [sic] physical and mental violence wreaked on infants and mothers by the abortion procedure, and to provide women with information and assistance in choosing non-violent and safer options to abortion ... [and] as a ... full-time, paid, professional, public spokesman and advocate of non-violent, direct action to protect the civil rights of preborn persons and consumers' rights advocate for their mothers.

Complaint, ¶ 21.

Defendants have moved to dismiss on several grounds. They argue that the statements are not defamatory *per se* as a matter of law under Illinois' fair comment rule with respect to lawsuits; that Ireland's statements at the press conference are opinions and are not actionable as a matter of law; that the statements are not defamatory *per se* under Illinois' innocent construction rule; that Count II should be dismissed because the statements are not injurious to Scheidler's profession; and that the suit should be dismissed for lack of personal jurisdiction over the defendants. We find merit to several of these arguments and as a result, dismiss the case in its entirety.

### Discussion

#### 1. Illinois Fair Comment Rule.

 An absolute privilege protects anything said or written in a legal proceeding. *Skopp v. First Federal Savings of Wilmette*, 189 Ill.App.3d 440, 545 N.E.2d 356, 360, 136 Ill.Dec. 832, 836 (1989); *Emery v. Kimball Hill, Inc.*, 112 Ill.App.3d 109, 445 N.E.2d 59, 61, 67 Ill.Dec. 767, 769 (1983). Under the Illinois fair comment rule, "a communication reporting the contents of a judicial proceeding is privileged, although it contains defamatory statements, if it is (a) accurate and complete or a fair summary of the proceedings, and (b) not made solely for the purpose of causing

harm to the person defamed." *Id.* To defeat the privilege accorded to publication of the contents of judicial proceedings and summaries thereof, plaintiff must allege that the statements were published *solely* for the purpose of defaming him and not for the purpose of informing the public. *American District Telegraph Co. v. Brink's Inc.*, 380 F.2d 131, 133 (7th Cir. 1967) (applying Illinois law). Plaintiff has failed to allege that the sole purpose of the statements made at the press conference and in the news release was to cause him harm and not to inform the public, and we believe it is unlikely that he can do so given the context of the statements. Therefore, we hold that those statements which accurately report and/or summarize the contents of defendants' lawsuit against plaintiff are protected by the fair comment rule, and plaintiff's claims based upon those statements must be dismissed with prejudice for failure to state a claim under Fed. R.Civ.P. 12(b)(6).

We note that to determine which statements accurately describe the NOW v. Scheidler, et al., lawsuit, we must refer to the complaint in that suit. We believe that, on a motion to dismiss, we can take judicial notice of this publicly filed document to determine, as a matter of law, which statements alleged by Scheidler to have been made by the defendants herein are privileged. Scheidler's suit is based upon the following statements, all set out verbatim above:

A. From the News Release:

1. Anti-abortion extremists are "terrorists ... operating ... through a pattern of violence, threats and intimidation" and naming Scheidler as a member of a steering committee organizing strategy for the extremists, which trains them in clinic invasions and other illegal tactics.

2. This group of anti-abortionists is not non-violent.

B. From the Press Conference:

1. YARD—We believe that these are criminal acts. They have burned and bombed clinics. Since we filed this case ... Joe Scheidler has been much quieter.

2. IRELAND—Scheidler (and others) picketed a clinic which they had previously invaded, injuring two people.

3. IRELAND—Scheidler was associated with the more overtly violent tactics. This statement is followed by a discussion of threats of reprisals made against clinic administrators, including Scheidler's statements that he was there to case a clinic, that he had never lost a tear over real estate being destroyed, and "so what" if one of their anti-abortion counselors drops a lit cigarette in a waste basket. Ireland then states, "Certainly that is encouraging and aiding abetting [sic] the people who are involved in the arsons and bombings." She also states that Scheidler read a letter to the anti-abortion conference at the beginning of their meeting from an individual in jail for bombings and arsons of clinics.

With respect to statement A.1., we believe that it is a fair statement of some of the allegations contained in the original complaint in the NOW v. Scheidler, et al., suit. Paragraph 19 of the complaint in that lawsuit alleges that the defendants in that suit pledged to create "a year of pain and fear" for everyone performing abortions. Paragraph 20 alleges that the defendants in that suit engaged in and/or encouraged others to engage in trespass and vandalism directed at abortion clinics, and that Scheidler has traveled throughout the country encouraging the use of unlawful methods of closing clinics. ¶ 24. The complaint specifically alleges that Scheidler participated in an effort to shut down a clinic, during which two people were injured, and that two people other than Scheidler were convicted on criminal charges as a result. ¶ 30. The complaint further alleges that Scheidler unlawfully entered a clinic, stated he was there to case it, threatened the clinic administrator with reprisals if she did not quit her job and was subsequently convicted of criminal trespass and harassment. ¶¶ 32, 34. We believe that these allegations may fairly be summarized as stating that Scheidler, along with his codefendants, operated through a pattern of violence, threats and intimidation, and that he trained others in his methods of clinic invasions and other illegal tactics. Hence, we

hold that the statements summarized in A.1. are protected under the fair comment rule.

Similarly, the statement in A.2. that the group is not non-violent can fairly be said to summarize certain contentions made in the complaint, particularly those contained in paragraph 30, described above. Hence, we find it is also protected by the fair comment rule. Statement B.2. merely summarizes paragraph 30 of the complaint and must also be protected.

Yard's statement in B.1., however, clearly is not protected by the fair comment rule, since the complaint in NOW v. Scheidler, et al., contains no allegations that any defendant participated in any arson or bombing of a clinic. Similarly, none of the allegations made by Ireland in B.3., concerning statements made by Scheidler (except for his comment about casing a clinic) are contained in NOW's complaint. Hence, this statement is not protected under the fair comment rule.

### 2. Statements as Opinions

■ Defendants argue that Ireland's statements, contained above in B.3., are non-actionable statements of opinion, and that plaintiff's claims with respect to them should be dismissed under Rule 12(b)(6). In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3006–3007, 41 L.Ed.2d 789 (1974), the Supreme Court held that opinions are constitutionally protected and may not form the basis of a claim for defamation. The Court said: "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* The Illinois Supreme Court recently discussed *Gertz.* It noted that expressions of opinion are constitutionally protected. *Mittelman v. Witous*, 135 Ill.2d 220, 552 N.E.2d 973, 983, 985, 142 Ill.Dec. 232, 242, 244 (1989) ("statements of opinion are never actionable") (citations omitted). The court sought to illuminate the distinction between a statement of fact and opinion, and cited the Restatement (Second) of

Torts §§ 559, 565, 566 for the following propositions:

> "Pure opinion" is used in the Restatement to denote an expression of opinion by which the maker of a comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. If both parties to the communication know the facts or assume their existence, the maker of the comment need not himself express the alleged facts. (Restatement (Second) of Torts § 566, comment b, at 171 (1977).) Pure opinion is to be distinguished from what the Restatement refers to as "mixed" expression of opinion, which is an opinion in form or context that is apparently based upon facts which have not been stated by the defendant or assumed to exist by the parties to the communication. (Restatement (Second) of Torts § 566, at 172 (1977).) The mixed expression of opinion may give rise to the inference that there are undisclosed facts that justify the opinion expressed. If so, it is actionable.
>
> This court has, in the past, recognized the distinction made in the Restatement and held the latter type of opinion actionable....
>
> "If the defendant bases his expression of a derogatory opinion of the plaintiff on his own statement of false and defamatory facts, he is subject to liability for the factual statement but not for the expression of opinion." Restatement (Second) of Torts § 566, comment c(1) (1977).

*Mittelman,* 552 N.E.2d at 983–984, 142 Ill. Dec. at 242–243. We think it clear under this standard that Ireland's comments summarized in B.3. are protected opinions, supported by underlying facts which she specifically states and which Scheidler has nowhere alleged are false or defamatory. The facts Ireland stated, the truth of which Scheidler nowhere contests, are that Scheidler entered a clinic stating he was there to case it, that he threatened the clinic administrator, that he stated that he had never shed a tear over real estate being destroyed, that he stated "so what" if one of the counselors throws a lit cigarette into a waste basket, and that he opened an anti-abortion conference by reading a letter from a convicted clinic bomber and arsonist. Ireland stated two opinions with regard to these facts: that Scheidler is associated with more overtly violent tactics, and that his actions encourage, aid and abet those involved in arsons and bombings. We find these last two statements were clearly expressions of pure opinions, that they were made in light of the other facts Ireland stated, and that they are constitutionally protected opinions. We note that Illinois courts have held that calling one who performs an abortion a "killer" is an expression of opinion and is not defamatory *per se. See Van Duyn v. Smith,* 173 Ill.App.3d 523, 527 N.E.2d 1005, 1013, 123 Ill.Dec. 367, 375 (1988). We believe that Ireland's statements similarly expressed her opinion of Scheidler's actions, and did not imply the existence of any undisclosed facts upon which her opinion was based. Accordingly, we find the statements were not defamatory *per se* as a matter of law. Therefore, we dismiss with prejudice Scheidler's claims with respect to these statements for failure to state a claim.

### 3. Innocent Construction Rule

■ Under Illinois law,

A statement is defamatory *per se* if it is so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary. Language which falsely imputes the commission of a criminal offense, ... unfitness or want of integrity in performing duties of employment, or which prejudices a person in his or her profession is considered defamatory *per se.* In determining whether language defames a plaintiff, Illinois courts apply a rule of innocent construction. Under this rule, a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if as so construed, the statement may reasonably be innocently interpreted, it cannot be actionable *per se.* The preliminary deter-

mination of whether the words may be innocently construed, is a question of law to be resolved by the court in the first instance....

*Skopp*, 545 N.E.2d at 359, 136 Ill.Dec. at 835 (citations omitted). Under the innocent construction rule, the court must consider the statement in context, with the words and implications therefrom given their natural and obvious meaning. If they may then be innocently interpreted or if they may reasonably be interpreted as referring to someone other than the plaintiff, they are not actionable as defamation *per se*. *Owen v. Carr*, 113 Ill.2d 273, 497 N.E.2d 1145, 1146, 100 Ill.Dec. 783, 785–786 (1986).

Defendants argue that Yard's statement (B.1.) (that defendants believe they are criminal acts; that they have burned and bombed clinics; but that since the filing of the lawsuit, Scheidler and some of the other defendants have been quieter) is covered by the innocent construction rule because the statement that they have burned and bombed clinics is vague as to whom "they" refers and may reasonably be interpreted as referring to someone other than Scheidler. We disagree. Given the statement following it, that Scheidler has been quieter since the filing of the lawsuit, it seems that the most reasonable interpretation of that statement is that it refers to Scheidler and the others also named as being "quieter." We do not believe that the statement can reasonably be interpreted as referring to only those other than Scheidler.

Defendants also argue that Ireland's statement in B.3. that Scheidler's actions have encouraged, aided and abetted the persons involved in the arsons and bombings is subject to the innocent construction rule. They argue, and we agree, that this statement, considered in context, may reasonably be interpreted as not charging Scheidler with any crime and hence will not support a claim of defamation *per se* under Count I of Scheidler's complaint. "For words imputing the commission of a crime to be libelous *per se*, the offense must be indictable, involve moral turpitude, and be punishable by death or imprisonment rather than by a fine." *Owens v. CBS, Inc.*,

173 Ill.App.3d 977, 527 N.E.2d 1296, 1305, 123 Ill.Dec. 521, 530 (1988).

Ireland's precise statement was that with respect to the actions enumerated (discussed above), "Certainly that is encouraging and aiding abetting [sic] the people who are involved in the arson and bombings." We hold that this statement can reasonably be construed as stating merely that these acts encouraged the people to commit arson and bombings in a general way, and not as charging Scheidler with criminal aiding and abetting. The statement does not say that Scheidler aided or abetted any given individual or that he specifically aided or abetted any particular act of bombing or arson. The allegation is far too vague to charge him with anything approaching criminal culpability, and it in no way implies that he was ever charged with or convicted of any such crimes. Hence, we hold that Scheidler has failed to state a claim against NOW and Ireland in Count I for defamation *per se* on the basis of charging him with a crime, based upon this statement. As noted above, we also hold that neither Count I nor Count II states a claim with respect to this statement because the statement is a constitutionally protected opinion.

This leaves the court with only Scheidler's claim that Yard's statement at the press conference that "we do believe that they are criminal acts. They have burned and bombed many clinics and that has decreased a lot since we have filed our case and John Ryan, as a matter of fact, has withdrawn active participation in the, uhm, so called 'Right to Life Movement.' Joe Scheidler has been much quieter ..." (B.1.), is defamatory. Defendants argue, however, that we have no personal jurisdiction over them with respect to this claim.

### 4. Personal Jurisdiction

■ Jurisdiction is based upon the Illinois long-arm statute. Defendants are not Illinois residents. Plaintiff alleges that defendants have committed a tort in Illinois and transacted business in Illinois giving rise to this lawsuit. Complaint ¶ 8. As factual support plaintiff makes allegations in his brief concerning actions taken by

defendants in Illinois with respect to their lawsuit against him, NOW v. Scheidler, et al., currently pending in the United States District Court for the Northern District of Illinois. Plaintiff also alleges that the news release was "published to several media outlets in Illinois.... On information and belief, they otherwise transmitted the release into Illinois...." Complaint, ¶ 16. No allegation is made in the complaint that the statements made in Washington, D.C. at the press conference were ever, in any way, transmitted to or published in Illinois.

We note first that defendants' actions with respect to NOW v. Scheidler cannot form the basis for jurisdiction over them in this lawsuit, since those actions in no way gave rise to this lawsuit. The Illinois long-arm statute requires that in order for the court to have jurisdiction based upon transacting business in Illinois, the cause of action must arise from the transaction of that business. This lawsuit does not arise from the prior lawsuit. Rather, it arises from statements made by defendants which have no impact upon the earlier litigation. These statements were not made as part of that litigation (i.e. in court or at a deposition in connection with that lawsuit) and are independent of that lawsuit. Defendants' actions with respect to that lawsuit do not constitute a transacting of business which give rise to this lawsuit. Further, it is unclear to this court whether filing court papers and making court appearances in a case would ever constitute the "transacting of business" for purposes of the Illinois long-arm statute.

■ Plaintiff's second alleged basis for personal jurisdiction is that the allegedly defamatory statements were transmitted by defendants and others into Illinois. This would, if properly alleged, constitute sufficient ground for jurisdiction. However, the complaint alleges only that the news release, and *not* the contents of the press conference, were transmitted into Illinois. We have already held that, as a matter of law, plaintiff has failed to state a claim for defamation *per se* in either count of his complaint with respect to the statements contained in the news release. Since

plaintiff has failed to allege that the contents of the press conference were transmitted to and published in Illinois, we have no personal jurisdiction over defendants with respect to any allegations that statements made at the press conference were defamatory. Hence, we must dismiss the remaining allegations in the complaint, without prejudice, with leave to amend within thirty (30) days.

### Conclusion

Defendants' motion to dismiss is granted. The complaint is dismissed in its entirety, in part due to failure to state a claim for which relief may be granted and in remaining part due to lack of personal jurisdiction. The dismissal is with prejudice, except with respect to plaintiff's claims against defendants NOW and Yard involving statements made at the press conference, which claims are dismissed without prejudice, with leave to amend within thirty days, if plaintiff can state a basis for personal jurisdiction over these defendants in Illinois with respect to these claims.